**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-409-BAH |
| | ) | |
| U.S. DEPARTMENT OF GOVERNMENT EFFICIENCY *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRESERVATION ORDER**</u>

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

    I.    Musk and DOGE's Communications and Records Retention Practices. ... 3

    II.    Elon Musk is DOGE's De Facto Leader, Based on His Actions and Trump's Statements, Undermining Administration Claims to the Contrary. ........................................................................................................ 4

    III.    The FOIA Requests at Issue. .................................................................... 7

        A.    American Oversight Submits Eight FOIA Requests. .................... 7

        B.    Two Days After Judge Cooper's Order, DOGE Denies All of American Oversight's FOIA Requests. .......................................... 8

LEGAL STANDARD .................................................................................................. 9

ARGUMENT ............................................................................................................ 10

    I.    American Oversight's Lawsuit Raises Serious Legal Questions as to DOGE's Obligations to Preserve Records Under the FRA and Release them Under FOIA. ................................................................................... 10

        A.    A Preservation Order is Necessary Where a Plaintiff Raises a Serious Legal Question. ............................................................... 11

        B.    Although Not Necessary for a Preservation Order, American Oversight is Likely to Succeed on the Merits of its FOIA Claims. ........................................................................................ 12

    II.    American Oversight Will Be Irreparably Harmed Absent a Preservation Order Because There Is a Likelihood Documents Will Be Destroyed. ..... 15

        A.    Even if DOGE Complies with the Presidential Records Act, Records Responsive to American Oversight's Requests May be Lost. ............................................................................................ 16

        B.    DOGE's Record-Keeping Practices Present Substantial Risk that Records Will Not be Preserved. ................................................... 18

        C.    DOGE's Behavior in This Case and Others Raises the Risk of Destruction of Documents Because it Evidences the Narrowest Possible View of its Preservation Obligations. ............................. 19

III.    The Requested Relief Will Not Burden Any Valid Governmental Interests. ................................................................................................ 21

IV.    The Public Interest Favors a Preservation Order Given FOIA's Purpose of an Informed Citizenry. .............................................................................. 21

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y,*
  No. CV 14-765 (GK), 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ...............................*Passim*
*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.,*
  2025 WL 542825 (D.D.C. Feb. 14, 2025) ........................................................................ 12
*Am. Oversight v. U.S. Dep't of Just.,*
  No. 24-cv-02789-PLF ........................................................................................................ 16
*Armstrong v. Exec. Off. of the President, Off. of Admin.,*
  1 F.3d 1274 (D.C. Cir. 1993)............................................................................................ 17
*Chambers v. U.S. Dep't of Interior,*
  568 F.3d 998 (D.C. Cir. 2009).......................................................................................... 9
*Citizens for Resp. & Ethics in Washington v. Off. of Admin.,*
  565 F. Supp. 2d 23 (D.D.C. 2008)...........................................................................*Passim*
*Citizens for Resp. & Ethics in Washington v. Off. of Admin.,*
  566 F.3d 219 (D.C. Cir. 2009) .......................................................................................... 12
*Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.,*
  No. 25-CV-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ............................................*Passim*
*Democracy Forward Found. v. White House Off. of Am. Innovation,*
  356 F. Supp. 3d 61 (D.D.C. 2019).................................................................................... 12
*Does 1-26 v. Musk,*
  2025 WL 840574 (D. Md. Mar. 18, 2025) ........................................................................ 12
*NARA v. Favish,*
  541 U.S. 157 (2004) .......................................................................................................... 22
*Heartland Plymouth Ct. MI, LLC v. NLRB,*
  838 F.3d 16 (D.C. Cir. 2016)............................................................................................ 19
*Johnson v. U.S. R.R. Ret. Bd.,*
  969 F.2d 1082 (D.C. Cir. 1992)........................................................................................ 19
*Meyer v. Bush,*
  981 F.2d 1288 (D.C. Cir. 1993)................................................................................... 12, 13
*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.,*
  437 U.S. 214 (1978) .......................................................................................................... 22
*Soucie v. David,*
  448 F.2d 1067 (D.C. Cir. 1971)........................................................................................ 12
*Sum of $70,990,605,*
  2015 WL 1021118 ............................................................................................................. 10
*Sweetland v. Walters,*
  60 F.3d 852 (D.C. Cir. 1995)............................................................................................ 12
*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press,*
  489 U.S. 749 (1989) .......................................................................................................... 22
*U.S. Dep't of Just. v. Tax Analysts,*
  492 U.S. 136 (1989) .......................................................................................................... 16

*United States ex rel. Staggers v. Medtronic, Inc.*,
  2022 WL 4078969 (D.D.C. Sept. 6, 2022)........................................................... 9
*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977)........................................................................ 11
*Zhi Chen v. D.C.*,
  839 F. Supp. 2d 7 (D.D.C. 2011)..................................................................... 21

**Statutes**

44 U.S.C. § 2201(2)............................................................................................ 17
44 U.S.C. § 3301(a)(1)(A)................................................................................. 16
44 U.S.C. § 2201................................................................................................ 9

# INTRODUCTION

Just two days after Judge Cooper ordered Defendant U.S. DOGE Service ("DOGE"[1]) to preserve and release records under the Freedom of Information Act ("FOIA"),[2] and with the instant litigation pending since early February, DOGE belatedly denied American Oversight's months-old FOIA requests with a perfunctory, unsupported claim that DOGE is not subject to FOIA. Although this question remains unresolved and is the subject of litigation in multiple courts in this District and others, the government refused American Oversight's request to voluntarily enter into an agreement to preserve the records responsive to American Oversight's FOIA requests pending a determination on the merits of that question.

Therefore, in light of DOGE's recalcitrance and the very real threat that DOGE is failing to maintain and preserve records responsive to American Oversight's eight FOIA requests at issue in this case, American Oversight asks the Court to exercise its inherent authority to (1) order DOGE to preserve all records responsive to all eight of the FOIA requests at issue in this case, and (2) disclose whether all such records have been preserved to date.

Extraordinary events and circumstances justify this relief: DOGE, led (according to President Trump) by Elon Musk, is exerting unprecedented power to implement and execute major policy and personnel decisions without congressional consent. Through DOGE, Musk has issued and continues to issue authoritative commands to executive branch officials to freeze funding, fire federal employees, and access highly sensitive data systems. Yet only two days after another court

---

[1] "DOGE" is coterminous with "USDS," as DOGE is the acronym used publicly by Elon Musk, President Trump, and other White House officials when referring to actions taken by USDS and/or agency heads operating on directives from Musk as DOGE's leader. *See generally* Am. Compl. ¶¶ 41-55.

[2] *Citizens for Resp. & Ethics in Washington ("CREW") v. U.S. DOGE Serv.*, No. 25-CV-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) (Cooper, J.) [hereinafter *CREW III*]. Several of the key cases discussed in this memorandum involve CREW as plaintiff. For purposes of shorthand names, we number them chronologically.

in this district found DOGE is likely an agency subject to FOIA, *see CREW III*, 2025 WL 752367, at *10, and ordered it to preserve and produce related records on an expedited basis under FOIA, *id.* at *17, DOGE rejected American Oversight's FOIA requests by claiming that DOGE is not subject to FOIA—contrary to the spirit at least, if not the letter, of Judge Cooper's ruling.

Not only does DOGE refuse to disclose information the American people have a right to know under FOIA, it also refuses to confirm whether and how it is preserving and maintaining records. In fact, DOGE reportedly uses non-governmental, ephemeral messaging systems to communicate about official matters. Am. Compl. ¶¶ 81-83. Consequently, at least some agency records responsive to American Oversight's FOIA requests have likely already been destroyed or may soon be, despite Judge Cooper's March 10, 2025 injunction in *CREW III*. *Id.* at ¶ 83.

Thus, for the same reasons justifying that injunction, a real threat of irreparable harm to American Oversight and the public remains: if "the Court does not grant preliminary relief," records responsive to American Oversight's requests "will not be released anytime soon, if ever." *See CREW III*, 2025 WL 752367, at *14. The balance of the equities and public interest also weigh decisively in American Oversight's favor here: DOGE suffers no hardship in preserving agency records responsive to American Oversight's eight requests pending a final determination on the merits. Such an order merely preserves the possibility that American Oversight will be able to obtain the records it seeks should this Court agree with American Oversight and the other courts that have considered the question that DOGE is an agency subject to FOIA.

## BACKGROUND

DOGE's prolific activities since its inception on January 20, 2025 are laid out in detail in American Oversight's Amended Complaint.[3] To summarize briefly, DOGE's influence has been

---

[3] Am. Complaint ¶¶ 16-93; *see also Citizens for Resp. & Ethics in Washington v. U.S. Doge Serv.*, No. 25-CV-511 (CRC), 2025 WL 752367, at *1-4 (D.D.C. Mar. 10, 2025).

and continues to be immense and far-reaching, and the American public has been kept in the dark and confused about DOGE's operations and inner workings. What we do know so far is that DOGE staff are deployed throughout the executive branch, where they have effectively shut down USAID and the CFPB, *id.* ¶¶ 57-64, 69-70; halted payments on preexisting federal contracts despite orders to the contrary from Senate-confirmed Cabinet secretaries, *id.* ¶¶ 60-61; emailed more than two million federal employees with instructions, threatening termination for nonresponses, *id.* ¶¶ 38-39; gained access to multiple agencies' most sensitive computer systems that contain private health and financial information about American taxpayers, as well as classified information, *id.* ¶¶ 59, 65-69, 76; and a great deal more. And it has done these things at times without the involvement, approval, or even knowledge of the President or senior White House officials. *Id.* ¶¶ 37-38.

## I.    Musk and DOGE's Communications and Records Retention Practices.

DOGE's communications and other records pertaining to the above-described actions—records of urgent public concern—may have been removed or destroyed or may soon be. *Id.* at 16 ¶ 83. DOGE staff, including Musk, have used non-governmental, ephemeral messaging systems such as Signal to communicate regarding official matters since at least December 2024. *Id.* at 16 ¶ 82. On January 22, 2025, American Oversight sent a letter to Elon Musk in his capacity as DOGE's apparent leader, reminding him of the department's obligations to preserve federal records pursuant to the Federal Records Act ("FRA"), asking him to take action to preserve those records, notify the Archivist of "any actual, impending, or threatened" unlawful removal, alteration, or destruction of federal records, and initiate action through the Attorney General to recover records Musk had reason to believe were unlawfully removed, as the FRA requires. *Id.* ¶ 84. American Oversight has received no response. *Id.* at 17 ¶ 85.

In February, DOGE advisor Katie Miller publicly responded to concerns that the reported "migration" of DOGE communications systems to a system administered within the Executive

Office of the President was intended to bar the public's access to DOGE records, stating that DOGE is subject to the Presidential Records Act. *Id*. ¶¶ 87-88. If that were correct (it is not), it would shield DOGE's records from the public until *at least* 2034—five years after Trump leaves office and eight years after Defendant U.S. DOGE Service Temporary Organization is set to disband. *Id*. ¶ 88. Relying on the Presidential Records Act's weaker and more discretionary record-preservation provisions would also, as set forth below, allow DOGE to delete, destroy, or otherwise fail to preserve whole categories of records that would be otherwise subject to retention requirements and disclosure under FOIA.

## II.    Elon Musk is DOGE's De Facto Leader, Based on His Actions and Trump's Statements, Undermining Administration Claims to the Contrary.

From DOGE's inception, Trump has identified Elon Musk as the leader of DOGE, apparently even naming the agency after a cryptocurrency promoted by Musk. Am. Compl. ¶¶ 16-17. Trump and his spokespeople have repeatedly pointed to Musk as DOGE's leader and referred to Musk and DOGE collectively as the forces behind unprecedented cuts in the executive branch. For example, Trump himself told an audience of investors and executives in Miami, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." *Id.* ¶ 47. He repeated this sentiment before a Joint Session of Congress on March 4, 2025, telling the assembled leaders of the legislative branch and a live national television audience, "I have created the brand new Department of Government Efficiency . . . [w]hich is headed by Elon Musk, who is in the gallery tonight." *Id.* ¶ 55.

Trump's press secretary Karoline Leavitt has also repeatedly confirmed that Musk is the functional leader of DOGE. She stated that Trump "campaigned across this country with Elon Musk vowing that Elon was going to head up the Department of Government Efficiency," *id.* ¶ 44; told reporters that "the President tasked Elon Musk to oversee the DOGE effort," *id.* ¶ 52;

discussed Musk's potential conflicts of interest stemming from his work with DOGE, *id.* ¶ 45; highlighted Trump's desire for Musk to be "more aggressive" because "DOGE thus far has proven incredibly successful in making our government more efficient," *id.* ¶ 51; and explained that Musk attended a Cabinet meeting because "Elon is working with the Cabinet secretaries and their staff every single day to identify waste and fraud and abuse at these respective agencies. All of the Cabinet secretaries take the advice and direction of DOGE," *id.* ¶ 54.

Moreover, Musk has held himself out as leader of DOGE. At the first Cabinet meeting of this administration, Musk was not only in attendance but spoke at length about DOGE's work overhauling the executive branch. *Id.* ¶¶ 53-54. He took credit on his social media platform X (formerly Twitter) for "feeding USAID into the wood chipper." *Id.* ¶ 63. He has reportedly given his phone number to Republican Senators so they can contact him directly to request the reversal of DOGE cuts that the senators find problematic.[4] He has made press appearances from the Oval Office, alongside Trump, discussing DOGE's work.[5] And in litigation surrounding Musk's takeover of the former Twitter, Musk's own attorneys filed a letter motion for a protective order seeking to shield Musk from sitting for a deposition in part on the grounds that "[t]he White House has designated Musk a 'special government employee' in charge of Establishing and Implementing the President's Department of Government Efficiency ("DOGE")." Letter from Jody C. Barillare to Hon. Todd M. Hughes Regarding Discovery Disputes, *Arnold v. X Corp.*, No. 23-cv-00528 (D.

---

[4] Liz Goodwin et al., *Musk Promises Better Communication between Republican Lawmakers, DOGE*, Wash. Post, updated March 5, 2025, https://www.washingtonpost.com/politics/2025/03/05/musk-congress-anger-doge/.
[5] *See, e.g.*, Hugo Lowell, *Elon Musk Appears with Trump and Tries to Claim 'Doge' Team is Transparent*, The Guardian (Feb. 11, 2025 8:52 PM EST), https://www.theguardian.com/us-news/2025/feb/11/elon-musk-trump-doge.

Del. March 19, 2025) (ECF No. 144), *available at*
https://www.courtlistener.com/docket/67399372/144/arnold-v-x-corp/.

Despite the extensive evidence to the contrary, the Government has implausibly claimed
in court filings that Musk does not lead DOGE, and that it is, in fact, led by Acting Administrator
Amy Gleason. For instance, in *CREW III*, Defendants filed a declaration from Gleason stating,
under penalty of perjury, that she "serve[s] as the Acting Administrator of USDS" and is "full-
time, government employee at USDS," and as such, she "oversee[s] all of USDS's employees and
detailees to USDS from other agencies." Decl. of Amy Gleason ¶¶ 2-4, *Citizens for Resp. & Ethics
in Washington v. U.S. Doge Serv.*, No. 25-CV-511 (D.D.C. March 14, 2025), ECF No. 20-2,
*available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277646/gov.uscourts.dcd.
277646.20.2_1.pdf. This declaration notably does not state the date on which she assumed the role
of Acting Administrator, giving only the date on which she joined the former U.S. Digital Service
under the prior administration. The declaration claims further that "Elon Musk does not work at
USDS. I do not report to him, and he does not report to me. To my knowledge, he is a Senior
Advisor to the White House." *Id.* ¶ 6. However, a sworn declaration in a different case, which the
Government initially sought to file under seal and is dated three days prior to Gleason's
declaration, states that Gleason was detailed from USDS to the Department of Health and Human
Services (HHS) in February 2025 and then converted to a direct, presumably full-time HHS hire
on March 4, 2025.[6] As far as American Oversight is aware, the government has not publicly

---

[6] *See* Decl. of Garey Rice ¶¶ 6-8, Principal Deputy Assistant Secretary of HHS, *Am. Fed'n of
Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-0339 (D.D.C. March 11,
2025) [hereinafter *AFL-CIO*], ECF No. 51-3, *available at*
https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.51.3_2
.pdf; Appointment Affidavit (OPM Form SF-61) of Amy Gleason, *AFL-CIO v. Dep't of Lab.*
(D.D.C March 18, 2025), ECF No. 65-1, *available at*
https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.65.1_1

reconciled these discrepancies, nor explained how Gleason can serve as an employee of HHS while also holding down her ostensible day job as full-time Acting Administrator of USDS. Decl. of Elizabeth Haddix in Supp. of Mot. for Preservation Order ("Haddix Decl.") ¶ 18.

### III.   The FOIA Requests at Issue.

#### A.   *American Oversight Submits Eight FOIA Requests.*

American Oversight has submitted eight FOIA Requests that are the subject of this litigation. All eight were submitted via both USDS's and OMB's email addresses.[7] The first two requests, submitted on January 30, 2025, and on which American Oversight sought expedited processing, relate to President Trump's January 24, 2025 removal of inspectors general from at least seventeen (17) federal agencies, citing "changing priorities" as the reason for their terminations. Am. Compl. ¶¶ 94-108 & Exs. A-B (the "IG Key Terms Request" and "IG External Communications Request").

On February 3, 2025, American Oversight sent six more FOIA requests to DOGE. Two of these sought records of the former U.S. Digital Service dating from prior to Trump's inauguration, concerning communications between that agency and the then-nascent, nongovernmental DOGE. *See* Am. Compl. ¶¶ 109-115 & Exs. E, G.

American Oversight sent four additional FOIA requests on February 3, 2025, seeking, *inter alia*, records concerning DOGE's communications with external entities, its staffing, Musk's

---

.pdf; Order, *AFL-CIO v. Dep't of Lab.* (D.D.C March 17, 2025), ECF No. 59, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.59.0.p df (denying government's motion to seal the SF-61s or redact from the SF-61s the affiants' names).

[7] American Oversight submitted its FOIA requests to both USDS and OMB because, as of the time they were submitted, USDS had not established clear contact information or any processes for intaking FOIA requests.

employment, and calendars to show how Musk allocates his time and who he meets with. *See* Am. Compl. ¶¶ 116-128 & Exs. I, K, M, O.

Defendant OMB acknowledged all eight requests on February 4 and 5 but has communicated no further with American Oversight regarding the requests. Am. Compl. ¶¶ 99-100, 114, 118, 121, 124, 127 & Exs. C, D, F, H, J, L, N, P; *see also* Haddix Decl. ¶¶ 10-11. No other Defendant communicated with American Oversight regarding these requests until DOGE's March 12 email, discussed below. *Id.* ¶ 11.

### B. Two Days After Judge Cooper's Order, DOGE Denies All of American Oversight's FOIA Requests.

On February 11, 2025, American Oversight filed this action, challenging DOGE's constructive denial of expedited processing for the IG Key Terms and IG External Communications Requests. ECF No. 1. On March 5, 2025, American Oversight filed its first amended complaint, adding additional claims under FOIA. ECF No. 5.

As this litigation was still pending, on March 10, 2025, Judge Cooper found a likelihood of success on the merits of another plaintiff's claim that USDS is an agency subject to FOIA. *CREW III*, 2025 WL 752367, at *10.

Just two days later, American Oversight received an email from admin@DOGE.eop.gov, "in reference to your Freedom of Information Act (FOIA) requests—the first of which was submitted on January 30, 2025, and multiple others on February 3, 2025." Haddix Decl. in Opp'n to Defs.' Mot. to Extend Time ¶ 23 & Ex. 1 (ECF Nos. 10-1, 10-2). Though the email provided no other identifying details, this would appear to encompass all eight requests at issue in this lawsuit. DOGE wrote:

> As set forth in Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," USDS sits within the Executive Office of the President, and the USDS Administrator reports to the President's Chief of Staff. We write now to inform you that USDS is subject to the

Presidential Records Act, 44 U.S.C.S. § 2201 et seq., and is not subject to FOIA. We therefore decline your request.

*Id.*

DOGE made no reference to Judge Cooper's order just two days earlier establishing that DOGE *is* likely subject to FOIA.

## LEGAL STANDARD

An agency may not "destroy[] a document after it has been requested under FOIA." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1004 (D.C. Cir. 2009). And "'[f]ederal courts have the inherent power to issue orders preserving information relevant to the claims and defenses brought before them.'" *CREW III*, 2025 WL 752367, at *16 (quoting *United States ex rel. Staggers v. Medtronic, Inc.*, No. 1:15-CV-392, 2022 WL 4078969, at *2 (D.D.C. Sept. 6, 2022)).

In considering whether to grant a preservation order, some courts apply the preliminary injunction standard, finding a preservation order warranted where a plaintiff shows (1) a likelihood of success on the merits, (2) irreparable harm to the movant absent a preservation order, (3) harm to other parties, and (3) whether the public interest favors the order. *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, No. CV 14-765 (GK), 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016); *see also Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 565 F. Supp. 2d 23, 29 (D.D.C. 2008) [hereinafter *CREW I*] (applying preliminary injunction standard to grant analogous motion for stay pending appeal). However, "there is no binding authority instructing this Court how to weigh preservation order requests," and courts may apply less stringent balancing tests or standards rooted in their inherent power to maintain the status quo. *Staggers*, 2022 WL 4078969 at *2 (collecting cases); *see also CREW III*, 2025 WL 752367, at *16 (noting without deciding that preservation order could be granted either pursuant to court's inherent

authority or as preliminary relief). The Court need not decide here which test prevails, as American Oversight easily satisfies even the highest standard for relief.

## ARGUMENT

Preservation orders are generally unnecessary in typical FOIA cases, because most government agencies do not deny their basic obligations of preservation and disclosure under the Federal Records Act and FOIA.[8] Here, however, DOGE insists that it is not subject to FOIA (or, implicitly, the FRA), even after another judge in this district found that it likely is, and issued a preliminary injunction and preservation order. Under these circumstances, where there are serious legal questions concerning DOGE's obligations under FOIA, irreparable harm to American Oversight should the records responsive to its requests be destroyed, no harm to DOGE from ordering it to preserve records, and a strong public interest in preserving the records and this Court's ability to order meaningful relief, all factors weigh in favor of an order requiring DOGE to preserve all records responsive to American Oversight's FOIA requests pending the outcome of this litigation.

## I.    American Oversight's Lawsuit Raises Serious Legal Questions as to DOGE's Obligations to Preserve Records Under the FRA and Release them Under FOIA.

The serious legal questions as to DOGE's statutory obligations weigh heavily in favor of an order requiring preservation of relevant records pending resolution of those question. Particularly where, as here, there is a "significant risk of alteration or destruction" of relevant records, *Sum of $70,990,605*, 2015 WL 1021118 at *2, the serious legal questions pending before this Court render that a preservation order all the more necessary. Furthermore, as American

---

[8] Indeed, it is for this reason that American Oversight only seeks this preservation order as to DOGE, not Defendant OMB. At this time, Plaintiff is not aware of any reason to believe that OMB is violating its records preservation obligations.

Oversight is indeed likely to succeed on the merits of its claim that DOGE is an agency subject to FOIA, a preservation order is more than appropriate.

### A. A Preservation Order is Necessary Where a Plaintiff Raises a Serious Legal Question.

A plaintiff need not prove its case to demonstrate entitlement to a preservation order. "'[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, No. CV 14-765 (GK), 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 844 (D.C. Cir. 1977)) (granting in part motion to compel preservation of records pending determination of whether they were agency records subject to FOIA)). A court need not find a "mathematical probability" of "ultimate success"; rather, preservation orders are warranted where a case presents a "serious legal question." *CREW I*, 565 F. Supp. 2d at 28.

Here, American Oversight is likely to succeed on the merits of its underlying FOIA claims, but even it ultimately does not, a preservation order is still appropriate. In *CREW I*, where the court confronted virtually the same legal question, at issue was plaintiff's FOIA requests to the White House Office of Administration (OA) and OA's assertions that it was subject to the Presidential Records Act, not FOIA. The district court implemented a preservation order throughout the pendency of the litigation and subsequently granted OA's motion to dismiss, holding that OA was not subject to FOIA. Nonetheless, despite ruling *against* CREW on the merits, the court *granted* CREW's motion for a stay pending appeal and ordered OA to continue to preserve records potentially responsive to CREW's FOIA request. *CREW I*, 565 F. Supp. 2d at 28-29. It held that

CREW's case presented a "serious legal question," and thus warranted a stay to preserve the status quo. *Id.*

### B. Although Not Necessary for a Preservation Order, American Oversight is Likely to Succeed on the Merits of its FOIA Claims.

Here, not only does American Oversight present "serious legal questions" that go to the heart of a debate roiling American society, American Oversight *is* likely to succeed on the merits of those serious legal questions. American Oversight's claims against DOGE all turn on the question of whether DOGE is an agency subject to FOIA. It is. Whether an entity within the Executive Office of the President ("EOP") is an agency subject to FOIA turns on whether "the entity in question 'wielded substantial authority independently of the President.'"[9] *Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) [hereinafter *CREW II*] (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)). And indeed, another judge in this District has already made this preliminary finding, and at least two other federal judges have reached the same conclusion on closely related questions. *See CREW III*, 2025 WL 752367, at *10 (holding on motion for preliminary injunction that "CREW has established a likelihood of success on the merits that . . . USDS is an agency subject to FOIA"); *see also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-0339, 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025) (Bates, J.) (holding that USDS is an agency under the Economy Act and suggesting the analysis would be the same under FOIA because "USDS appears to do much more than advise and assist the President"); *Does 1-26 v. Musk*, No. CV 25-0462-TDC,

---

[9] The D.C. Circuit had previously formulated the test of whether an EOP entity is an agency subject to FOIA in different ways in, *inter alia, Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) and *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993). *CREW II* harmonized the prior statements of the test and clarified that the ultimate question was whether an entity "wield[s] substantial authority independent of the President." *CREW II*, 566 F.3d at 222 (internal quotes omitted); *see also Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019) (*CREW II* "distilled the analysis" of whether an EOP entity is subject to FOIA).

2025 WL 840574, at *11 (D. Md. Mar. 18, 2025) (discussing "DOGE's level of influence, if not control," and noting "President Trump publicly acknowledged that Musk and DOGE wield significant influence across federal agencies" and "USAID officials who refused to comply with Musk's demands to give DOGE Team Members access to USAID secured facilities and computer systems were subsequently placed on administrative leave").

Nonetheless, DOGE clearly disagrees with the current weight of authority, having filed a Motion for Reconsideration in *CREW III*—which Judge Cooper rejected. *See* Order, *CREW III*, No. 25-CV-511 (CRC), ECF No. 23 (D.D.C. Mar. 19, 2025). The government almost immediately filed a Motion for Summary Judgment on the question of whether USDS/DOGE is an agency subject to FOIA on March 19, 2025. *Id.*, ECF No. 24. DOGE's disagreement on this legal question reflects its disagreement on its underlying legal obligations, meaning the records American Oversight has requested may well be at risk of loss or destruction.

The publicly available facts demonstrate why DOGE is incorrect and is in fact an agency subject to the FRA and FOIA. The DOGE executive orders delegate broad powers and responsibilities independent of the President. *See Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993) ("The greater the scope of the delegation—which also usually implies less continuing interaction with the President—the more independence an entity will exercise."). The first such order—Trump's January 20, 2025, Executive Order forming the Department of Government Efficiency—tasks it with "implement[ing] the President's DOGE agenda." *See Establishing and Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02005.pdf. To "implement" means to do far more than merely advise the President

regarding his DOGE agenda—it indicates substantial authority necessary to actually carry out that agenda. *See CREW III*, 2025 WL 752367, at *11.

The second executive order, issued February 11, 2025, expands upon DOGE's power by prohibiting agencies from "fill[ing] any vacancies for career appointments that the DOGE Team Lead assesses should not be filled" unless the agency head explicitly overrides the DOGE Team's decision. *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order No. 14,210 at § 3, 90 Fed. Reg. 9669 (Feb. 11, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-14/pdf/2025-02762.pdf. The February 26, 2025 executive order goes even further, tasking agency DOGE teams with constructing systems that overhaul the way federal payments are processed and issued and to advise agency heads on which federal contracts should be terminated or modified. *See Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025), https://www.govinfo.gov/content/pkg/FR-2025-03-03/pdf/2025-03527.pdf.

Beyond its founding documents, DOGE's actual activities span the entire executive branch, including functionally shuttering entire congressionally-created agencies. And it does these things without the involvement, approval, or even knowledge of the President or senior White House officials. *See, e.g.*, Am. Compl. ¶¶ 37-38. DOGE staff are deployed throughout the executive branch, where they have effectively shut down USAID and the CFPB, *id.* ¶¶ 57-64, 69-70; halted payments on preexisting federal contracts despite orders to the contrary from Senate-confirmed Cabinet secretaries, *id.* ¶¶ 60-61; emailed more than two million federal employees with instructions, threatening termination for nonresponses, *id.* ¶¶ 38-39; gained access to multiple

agencies' most sensitive computer systems that contain private health and financial information about American taxpayers, classified information, *id.* ¶¶ 59, 65-69, 76; and a great deal more.

The findings by other federal courts, combined with the facts alleged in American Oversight's Amended Complaint regarding DOGE's founding documents and real-world activities, are more than sufficient to raise "serious legal questions," *CREW I*, 565 F. Supp. 2d at 28, and "raise[] questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation," *Competitive Enter. Inst.*, 2016 WL 10676292, at *2. Those serious legal questions are enough for this Court to exercise its inherent and equitable powers to order DOGE to preserve records responsive to American Oversight's FOIA requests. Indeed, American Oversight is likely to succeed on the merits of these legal claims, making a preservation order in this case all the more appropriate.

## II.    American Oversight Will Be Irreparably Harmed Absent a Preservation Order Because There Is a Likelihood Documents Will Be Destroyed.

American Oversight will be irreparably harmed if DOGE is not ordered to preserve records responsive to all of American Oversight's FOIA requests because, absent such an order, it is likely never to receive the requested records, for three reasons. First, the Presidential Records Act (to which DOGE claims it is subject) protects a narrower set of documents than does FOIA or the FRA and accords the president a great deal more latitude over disposal of those records. Second, DOGE's record-keeping practices suggest that it may, to date, have been unfamiliar with or indifferent to its preservation obligations. Third, DOGE's conduct in this case suggests an unwillingness to preserve records.

Thus, if DOGE is not ordered to preserve all records potentially responsive to American Oversight's FOIA requests, many of those records may be irretrievably lost before any ultimate determination on the merits. American Oversight "would have absolutely no recourse in the event

that records potentially responsive to its FOIA requests were destroyed," which courts have found to be a "clear" case of irreparable harm. *See CREW I*, 565 F. Supp. 2d at 29-30; *see also Competitive Enter. Inst.*, 2016 WL 10676292, at *2 (irreparable harm where it was unclear whether agency controlled the documents request and whether the named custodian "would be required to maintain and produce" records should his federal employment terminate). This potential harm is particularly acute given American Oversight's mission to promote accountability in government through transparency by using FOIA to obtain records and disseminate information to the public. *See* Am. Compl. ¶¶ 5, 98, 104-106. *See also Am. Oversight v. U.S. Dep't of Just.*, No. 24-cv-02789-PLF (D.D.C. Oct. 21, 2024) (finding that American Oversight is an organization primarily engaged in disseminating information).

### A. Even if DOGE Complies with the Presidential Records Act, Records Responsive to American Oversight's Requests May be Lost.

Given DOGE's claim that it is not subject to FOIA, if DOGE is not ordered to preserve records responsive to American Oversight's claims, there is a strong likelihood that American Oversight will never get the requested records. The PRA imposes less stringent, more discretionary record retention obligations than FOIA (or its sister statute, the FRA), and oversight to ensure that presidential records are being duly preserved is minimal and largely toothless.

Federal law distinguishes "agency records," "federal records," and "presidential records." "Agency records" under FOIA is the broadest category. Under FOIA, any document is an agency record subject to FOIA if it was "created or obtained" by the agency and the agency is "in control of the requested materials at the time the FOIA request is made." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-45 (1989). The definition of "records" under the FRA is somewhat narrower, but still robust. *See* 44 U.S.C. § 3301(a)(1)(A) (defining "records" as those "made or received by a Federal agency under Federal law or in connection with the transaction of public

business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them"). And the definition of "presidential records" is narrower still: only those documents "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). For example, under FOIA, Musk's calendar entries showing how, as DOGE's de facto leader, he has spent his time, with whom he has met with, DOGE personnel staffing records, would certainly qualify as agency records under FOIA and likely as federal records under the FRA, but would not qualify as "presidential records" under the PRA.

Furthermore, the PRA's records preservation requirements are much looser and less enforceable than those that apply to DOGE as an agency. In comparing the FRA with the PRA, the D.C. Circuit emphasized that "[w]hereas federal records are subject to a strict document management regime supervised by the Archivist, . . . the PRA 'accords the President virtually complete control over his records during his term of office.' . . . . Neither the Archivist nor an agency head can initiate any action through the Attorney General to effect recovery or ensure preservation of presidential records." *Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1290–91 (D.C. Cir. 1993) (internal quotation and citation omitted). And although the Archivist may "request congressional advice regarding the President's intention to dispose of presidential records . . . , neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Id.* at 1291 (internal quotation omitted).

Accordingly, even assuming DOGE's scrupulous compliance with its purported obligations under the PRA—which is not guaranteed, given, for instance, DOGE staff's predisposition toward ephemeral messaging systems like Signal—many of the records American Oversight seeks may not be preserved absent an order from this Court.

### B.  DOGE's Record-Keeping Practices Present Substantial Risk that Records Will Not be Preserved.

If DOGE were allowed to cloak itself in the mantle of the PRA, it would likely use this wide latitude to dispose of the records requested by American Oversight before they ever see the light of day. In fact, it appears that is what it has already done. For example, there is public reporting that members of DOGE used Signal—which is often employed for its ability to automatically and permanently delete messages—to communicate. Am. Compl. ¶¶ 81-83. Indeed, "USDS employees acknowledged using Signal, an encrypted messaging app with an auto-delete function, during the presidential transition period and into the new administration, as recently as February 27." *CREW III*, 2025 WL 752367, at *16. DOGE employees were also instructed to cease using OMB's Slack system, which had been specially configured to ensure the former U.S. Digital Service's compliance with FOIA and the FRA. Am. Compl. ¶¶ 86-89. As Judge Cooper noted, the "evidence gives rise to the possibility that representatives of the Defendant entities may not fully appreciate their obligations to preserve federal records. This is especially true for USDS, many of whose staffers are reported to have joined the federal government only recently and, to put it charitably, may not be steeped in its document retention policies." *CREW III*, 2025 WL 752367, at *17.

### C. *DOGE's Behavior in This Case and Others Raises the Risk of Destruction of Documents Because it Evidences the Narrowest Possible View of its Preservation Obligations.*

DOGE's contumacy further indicates a high likelihood of irreparable harm. DOGE denied American Oversight's FOIA requests on the purported grounds that it is not subject to FOIA two days *after* Judge Cooper ruled the precise opposite in *CREW III*. Although Judge Cooper's order applied only to CREW's FOIA requests, DOGE's non-acquiescing response to American Oversight just two days later strongly suggests that it is taking the least restrictive view of its records-preservation obligations.[10]

Furthermore, DOGE refused to stipulate that it would preserve records responsive to American Oversight's requests, even as part of conferral regarding Defendants' requested extension of time in FOIA litigation concerning the very question of DOGE's obligations under FOIA. Haddix Decl. ¶ 16. This raises the reasonable inference that DOGE intends to reserve the option to destroy records that would be responsive to American Oversight's FOIA requests. If this Court ultimately rules that DOGE is subject to FOIA but, in the interim, DOGE disposes of records responsive to American Oversight's requests, those records are simply gone. American Oversight and the public it serves will never see them. This is the textbook definition of irreparable harm.

Moreover, DOGE has displayed a troubling lack of candor across multiple cases pending in this District regarding facts as basic as who is in charge, suggesting that DOGE may not strictly adhere to its obligations to preserve records relevant to pending litigation. As discussed *supra*,

---

[10] DOGE's decision to treat Judge Cooper's decision as only binding in that particular case is not technically intra-*circuit* non-acquiescence, which "has been condemned by almost every circuit court of appeals that has confronted it." *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1091 (D.C. Cir. 1992); *see also Heartland Plymouth Ct. MI, LLC v. NLRB*, 838 F.3d 16, 24 (D.C. Cir. 2016) (finding agency's intracircuit nonacquiescence in bad faith, and noting that it does harm "on not only the courts, but on the American people too"). However, DOGE's action suggests intransigence inconsistent with respect for judicial orders.

DOGE has filed declarations from Acting Administrator Gleason stating unequivocally that she oversees the U.S. DOGE Service and all its employees and detailees. Decl. of Amy Gleason ¶¶ 2-4, *Citizens for Resp. & Ethics in Washington v. U.S. Doge Serv.*, No. 25-CV-511 (D.D.C. March 14, 2025), ECF No. 20-2, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277646/gov.uscourts.dcd.277646.20.2_1.pdf. This declaration does not, however, give the date on which she assumed that role, stating only the date on which she joined the former U.S. Digital Service under the prior administration. And at the same time, the government has filed sworn evidence in other cases that Gleason is, in fact, a direct and full-time hire of the Department of Health and Human Services.[11] DOGE has offered no explanation for how a full-time employee of HHS can also oversee the vast array of work in which DOGE is engaged. Nor has DOGE explained the discrepancy between Gleason's claims to run the entity and the abundance of public evidence that Elon Musk is in fact in charge.

In sum, there are multiple independent reasons to doubt whether the records requested by American Oversight will be preserved, and the permanent destruction of those records would irreparably harm American Oversight, given its mission of informing the public of matters of national significance so that people can engage in critical national debates. Only an order requiring DOGE to preserve records response to American Oversight's FOIA requests can prevent this harm.

---

[11] *See* Decl. of Garey Rice ¶¶ 6-8, Principal Deputy Assistant Secretary of HHS, *AFL-CIO*, No. CV 25-0339, ECF No. 51-3, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.51.3_2.pdf; Appointment Affidavit (OPM Form SF-61) of Amy Gleason, *AFL-CIO v. Dep't of Lab.* (D.D.C March 18, 2025), ECF No. 65-1, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.65.1_1.pdf; Order, *AFL-CIO v. Dep't of Lab.* (D.D.C Mar. 17, 2025), ECF No. 59, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.59.0.pdf (denying government's motion to seal the SF-61s or redact from the SF-61s the affiants' names).

### III.    The Requested Relief Will Not Burden Any Valid Governmental Interests.

All American Oversight seeks is to preserve the Court's ability to grant meaningful relief after litigation on the merits by requiring DOGE to do what all parties in civil litigation must do: "preserve potentially relevant evidence once [that party] anticipates litigation." *See Zhi Chen v. D.C.*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (cleaned up and internal quotation omitted). Furthermore, given the likelihood that DOGE is subject to FOIA, DOGE cannot be harmed by an order compelling it to preserve records responsive to American Oversight's requests—in other words, complying with its legal obligations. And any claim that it will be harmed by expending resources to do so is equally unavailing. *Cf. CREW III*, 2025 WL 752367, at *16 ("[G]iven that USDS is apparently not processing any other requests, the Court doubts it would impose much of a burden on the department to expediently process CREW's request.").[12] Lastly, given the importance of both the legal questions presented and the underlying records at issue, a preservation order here is appropriate to give American Oversight some enforcement mechanism for noncompliance. *See CREW I*, 565 F. Supp. 2d at 29-31 (finding no harm to government because "the assurances of OA's counsel do not have the force of a Court Order, and . . . violations of such assurances are not punishable by contempt. While the Court accepts OA's counsels' assurances that the documents responsive to CREW's FOIA requests will be preserved, absent a Court Order to that effect, CREW would have no recourse if they were not.").

### IV.    The Public Interest Favors a Preservation Order Given FOIA's Purpose of an Informed Citizenry.

FOIA exists "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the

---

[12] Even assuming that (as a result of Judge Cooper's order) DOGE is now in fact processing CREW's request, its apparent non-acquiescence policy indicates that it is not processing any *other* requests and may not be preserving records responsive to any other requests.

governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 774 (1989) ("FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny[.]" (italics omitted)). Thus, in FOIA cases, "[t]he Public Interest weighs heavily in favor of issuing a Preservation Order" to "ensur[e] that records are preserved while the Court considers whether their disclosure is appropriate under FOIA." *Competitive Enter. Inst*., 2016 WL 10676292, at *4 (cleaned up). Accordingly, ordering DOGE to preserve its records serves the public interest because it will ensure that these documents remain available to the public if DOGE is held to be an agency subject to FOIA.

In *CREW I*, even after the court had already ruled that OA was *not* an agency subject to FOIA, it still renewed the preservation order that had been in place throughout the litigation and ordered OA to "preserve all records, no matter how described, currently in its possession or under its custody or control, which are potentially responsive to" the FOIA requests at issue pending appeal to the circuit court. *CREW I*, 565 F. Supp. 2d at 26. Given FOIA's fundamental purpose to "ensure an informed citizenry," the court held that "the public interest strongly favor[ed]" a preservation order because if OA were ultimately held to be subject to FOIA, its records would be "subject to disclosure [and] belong[] to all." *Id.* at 31 (quoting *NARA v. Favish*, 541 U.S. 157, 172 (2004).

It is therefore in the public interest here to order DOGE to preserve all records responsive to American Oversight's FOIA requests.

## CONCLUSION

For the foregoing reasons, American Oversight respectfully requests that this Court grant its motion for a preservation order that would require DOGE to preserve all records responsive to American Oversight's eight FOIA requests at issue in this matter pending a final determination on

the merits and order DOGE to inform the Court whether all records that may be responsive to any of American Oversight's FOIA requests have been preserved to date.

Dated: March 24, 2025

Respectfully submitted,

*/s/ David Kronig*
Elizabeth Haddix
D.C. Bar No. 1030649
Elizabeth Haddix
D.C. Bar No. 90019750
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 869-5246
david.kronig@americanoversight.org

*Counsel for Plaintiff*